## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JORGE LOPEZ,** | Civ. No. 2:10-06374 (KM)(MAH) |
| **Plaintiff,** | |
| **v.** | **OPINION** |
| **ESTELLA LOPEZ,** **VERIZON NEW JERSEY INC., et al.,** | |
| **Defendants.** | |

**MCNULTY, U.S.D.J.:**

This matter comes before the Court upon the motion of the Defendants, Estella Lopez and Verizon New Jersey, for summary judgment. Finding that there is no material issue of fact requiring a trial, I enter summary judgment in favor of the Defendants.

## I.     BACKGROUND

The Plaintiff, Jorge Lopez,[1] commenced this action in the New Jersey Superior Court of Morris County, Case No. BER-L-08452-10, and filed a First Amended Complaint (hereinafter "Complaint") in that court on October 1, 2010. (Docket No. 1). The Complaint alleges claims for retaliation under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615(a)(1)(2); for discrimination in violation of the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. 10:5-1; and for breach of contract. Compl. ¶¶ 24-67.

On December 8, 2010, the Defendants filed a Notice of Removal to this Court pursuant to 28 U.S.C. § 1446. (Docket No. 1). The case was originally assigned to Judge Peter G. Sheridan, transferred to Judge Esther Salas on June 22, 2011 (Docket No. 21), and reassigned to me on August 1, 2012. (Docket No. 69).

---

[1]     To avoid confusion, Jorge Lopez will be referred to as "Plaintiff," and Estella Lopez will be referred to as "Defendant Lopez." To the Court's knowledge, they are not related.

I consider the facts as stated in the Defendants' Statement of Undisputed Material Facts ("Def. SUMF") and Plaintiff's Responsive Statement of Material Facts ("Pl. RSMF") pursuant to L. Civ. R. 56.1, and in the deposition transcripts and documentary exhibits submitted as exhibits. Facts not contested are assumed to be true.

## A. Plaintiff's Medical History

Plaintiff, Jorge Lopez, is a United States Marine Corps veteran. J. Lopez Dep. (Docket 62-14) at 62. He received a medical discharge in June 1996. *Id.* at 72. Plaintiff has been diagnosed with bipolar disorder and post-traumatic stress disorder ("PTSD"). J. Lopez Dep. at 38-40; SSA Notice of Decision, Aron Decl. Exh. C (Docket No. 59-1) at 9-10. Plaintiff was first diagnosed with bipolar disorder in or about late 2003 to early 2004, but had been experiencing the symptoms for several years before that. *Id.* at 40-41. Plaintiff first experienced symptoms of PTSD, and was first diagnosed with PTSD, in 2004. *Id.* at 45-46.

## B. Plaintiff's Employment at Verizon

On June 12, 2000, Verizon hired Plaintiff as a Bilingual Sales and Service Consultant in its Jersey City call center. J. Lopez Dep. (Docket No. 62-14) at 90; E. Lopez Decl. (Docket No. 60) ¶ 3. Plaintiff's job responsibilities included fielding customer phone calls, providing customer service and sales. Def. SUMF ¶ 10; J. Lopez Dep. at 111. Plaintiff remained in that position during his employment at Verizon, but his job location changed. Def. SUMF ¶ 9, Pl. RSMF (Docket No. 63) ¶13. Verizon's Jersey City call center was relocated to Newark in late 2005. Def. SUMF ¶ 14. From then until the end of his employment, Plaintiff worked in the Newark location. *Id.*; *see also* Pl. RSMF ¶ 18.

### 1. Verizon's Code of Conduct

The Defendants allege that Plaintiff violated the Verizon Business Code of Conduct ("Code of Conduct"). The Code of Conduct applies to "everyone who acts on behalf of Verizon Business and its controlled subsidiaries and affiliates—including employees, executive officers, agents, consultants, contingent workers and interns." Code of Conduct, Exh. A (Docket No. 76) at 8.

The Code of Conduct contains a disclaimer labeled "Legal Notice." *Id.* at 10. That disclaimer states:

This Code of Conduct is not an employment contract. Adherence to the standards of this Code of Conduct is a condition of continued employment. This Code does not give you rights of any kind, and may be changed by the company at any time without notice.

*Id.*

The Code of Conduct prohibits violent, hostile, and abusive behavior in the workplace or on company property. *Id.* at 11. It further states that Verizon "will take immediate and appropriate action against offenders, up to and including termination and referral for criminal prosecution." *Id.* Damage to property is also prohibited. *Id.*

## 2. Plaintiff's Contact With Defendant Lopez

The parties disagree as to how much contact the Plaintiff had with Defendant Lopez. Defendants assert that the two had "little day-to-day contact." Plaintiff asserts that they had daily email contact and saw each other "at least every other day." Def. SUMF ¶ 13; Pl. RSMF ¶ 17.

In August 2006, after some Verizon team leaders complained that they felt bullied and threatened, Defendant Lopez scheduled a meeting between union stewards and team leaders. Def. SUMF ¶ 15; J. Lopez Dep. at 156. At that meeting, Plaintiff cursed at three Verizon managers, including Defendant Lopez. *Id.* ¶ 16; J. Lopez Dep. at 161-62 (stating that Plaintiff "los[t] control" of his words); E. Lopez Decl. Exh. 2 (Docket No. 60).

This is Plaintiff's description of the incident, taken from his deposition:

I said to Mr. Diabattista, "You're fucked up." I looked at Estela Lopez and I said, "You disappoint the shit out of me." And what I turned to Yesenia Vega, I said, "I don't even want to start with the affairs and shit you have going on your team."

Def. SUMF ¶ 16; J. Lopez Dep. at 162.[2] Plaintiff was thereafter suspended for fifteen days. Def. SUMF ¶ 18; Pl. RSMF ¶ 23. Plaintiff was warned that his behavior violated Verizon's Code of Conduct and that further violations could result in his termination. *Id.*

In response to the suspension, Plaintiff filed a grievance with Verizon. *Id.* ¶ 19. The grievance was denied. *Id.* Plaintiff's union appealed the outcome of

---

[2]    Plaintiff's responsive statement of material facts denies that the outburst occurred, directly contradicting his deposition testimony. Pl. RSMF ¶ 22.

the grievance through mediation. Def. SUMF ¶ 20. On April 30, 2007, the union and Verizon entered into a Mediation Stipulation of Settlement in which they agreed to a 15-day suspension of Plaintiff "with no recourse to mediation in lieu of discharge." *Id.*; E. Lopez Decl., Exh. 4 (Docket No. 60) at 30. Plaintiff took no further action. J. Lopez Dep. At 165-166. He now asserts that he abandoned his grievance because it was apparent that he would otherwise be fired. Pl. RSMF ¶ 24.

In 2007, Julio Cirilo was the Call Center Manager of the Bilingual Sales and Service team. Def. SUMF ¶ 34; J. Lopez Dep. at 183-84. Upon Plaintiff's request, he was permitted to transfer to a position under Cirilo's chain of command. *Id.* ¶ 35; J. Lopez Dep. at 183-84, 243-44. During this time period, Defendant Lopez worked as a facilitation manager and did not directly supervise any other employees. E. Lopez Dep. (Docket No. 62-17) at 58. In early 2008, Defendant Lopez returned to her previous position as Call Center Manager. E. Lopez Dep. at 58. At that point, Plaintiff reported to team leader Mary Lou Diaz, who reported to Defendant Lopez. E. Lopez Dep. at 76.

Plaintiff requested that he again be reassigned to a position under Cirilo. Def. SUMF ¶ 39; E. Lopez Decl. ¶ 11. Cirilo, however, had been reassigned to a staff job that did not have managers or associates in its chain of command. Def. SUMF ¶ 38. Defendant Lopez investigated the possibility of such a reassignment and consulted with Verizon Labor Relations. *Id.* ¶ 39; E. Lopez Decl. ¶ 11. She then advised Plaintiff that there was not a vacant job opening for which Plaintiff was qualified and that Cirilo no longer had a Bilingual Sales and Service team reporting to him. *Id.*

Plaintiff stated at his deposition that he brought suit against Defendant Lopez because "[s]he seemed to set out to hurt me." J. Lopez Dep. at 236; Def. SUMF ¶ 76. According to Plaintiff, Defendant Lopez was attempting to "[t]ake away the means by which I earn an income." J. Lopez Dep. at 238. Plaintiff explained that Dalia Perez, the Call Center employee responsible for FMLA leave and time off, told representatives "not to make a habit out of requesting time off." *Id.* at 237. (Plaintiff did not indicate that Perez specifically directed that comment at him. Def. SUMF ¶ 76.) When Plaintiff called Perez's statement "inappropriate," she responded that she would not apologize unless directed to do so by Defendant Lopez. J. Lopez Dep. at 237.

Plaintiff asserts that Defendant Lopez engaged in a "full-fledged war against the representatives in the office." J. Lopez Dep. at 238. In particular, Plaintiff indicated that Defendant Lopez ignored or mishandled employee

scheduling, fire safety, and requests for time off. *Id.* at 238-39. Plaintiff did not file a grievance with his union regarding these issues. *Id.* Plaintiff did not identify any other examples of Defendant Lopez attempting to "hurt" him. *Id.* at 239.

Plaintiff did not speak directly with Defendant Lopez about his disability or mental illness. *Id.* at 236. He stated, however, that while employed at Verizon, he spoke to his direct supervisors, Adriana Giz and Robert Fernandez, about his diagnoses and treatment for PTSD and bipolar disorder. *Id.*

### C. Plaintiff's FMLA Leaves

Verizon's Absence Reporting Center ("ARC") administers the absences of Verizon employees. Def. SUMF ¶ 22 (citing Keating Decl. (Docket No. 61) ¶ 1).[3] Among other things, ARC determines whether such absences qualify for coverage under the Family Medical Leave Act ("FMLA"). *Id.* In doing so, it must consider, for example, whether an absence is related to a serious health condition covered by the FMLA. *Id.* For that purpose, ARC tracks attendance records and communicates with employees and their health care providers. *Id.* ¶ 23. Employees and health care providers submit to ARC "FMLA Certification Forms" containing medical facts supporting the applications. *Id.*

Medical diagnosis information received by ARC, however, is not communicated to Absence Administrators or direct supervisors. Def. SUMF ¶ 28. ARC communicates with "Absence Administrators" at particular Verizon worksites regarding the expected duration of approved FMLA leaves for administratively eligible employees. *Id.* But ARC does not tell Absence Administrators or direct supervisors about the diagnoses of absent employees. *Id.* Even if the employee or health care provider has volunteered such medical information, ARC treats it as confidential. *Id.* Plaintiff nevertheless asserts that

---

[3]     Plaintiff objects to the Keating Declaration because Keating was not deposed, which made it "very difficult if not impossible for the Plaintiff to submit a cogent response." Pl. RSMF ¶ 25. The Declaration states that Theresa Keating is employed as a Senior Analyst at Verizon's ARC. Keating would have knowledge of Verizon's policies governing absences and FMLA leave and Plaintiff does not appear to contest the policies described in the declaration. *See id.* ¶¶ 25 – 28. Rather, he asserts that, despite such policies, Verizon human resources personnel had knowledge of his medical conditions. I do not find the dispute to be material. For the purposes of this motion, I assume Plaintiff's assertion to be correct—that Verizon knew about Plaintiff's medical conditions.

Verizon human resources had "full and complete knowledge of Plaintiff's disabilities." Pl. RSMF ¶ 26. This assertion has support in the record.[4]

Over the course of his employment at Verizon, Plaintiff submitted "numerous" FMLA Certification Forms to ARC. Def. SUMF ¶ 24. Three of these are attached to Defendants' papers. These forms correspond to intermittent absences commencing on (1) September 28, 2004 (occurring one to two days a week over a period of six months); (2) November 14, 2006 (occurring two to three times per month and lasting one to two days over a period of six months); and (3) June 28, 2007 (occurring two to three times a month and lasting one to two days over a period of 12 months). *Id.* ¶ 24 – 26; Keating Decl., Exh. A-C (Docket No. 61). The Certification Forms stated the basis for the absences. Keating Decl. ¶ 3. For the first set of absences, which commenced on September 28, 2004, the psychiatrist cited Plaintiff's "[d]epressed mood, inability to concentrate, low energy, mood swings." *Id.* For the second and third set of absences, which commenced on November 14, 2006 and June 28, 2007, the psychiatrist stated that Plaintiff was "unable to interact with co-workers" because of "[a]gitation, irritability and impulsivity" (November 2006 and June 2007). *Id.* ¶¶ 4-5. The Certification Forms did not specify a diagnosis. ¶ 27.

ARC's records show that Plaintiff obtained four FMLA approvals for intermittent leaves of absence from 2005 to 2008. *Id.* ¶ 29. Two of those leaves, in 2005 and in 2007, were in connection with the birth of Plaintiff's children. *Id.* The other two intermittent leaves, from November 2006 through May 2007, and from June 2007 to June 2008, were for absences in connection with Plaintiff's mental health. *Id.*

ARC's records further show the following absence episodes, which had varying durations:

| Year | Episodes | FMLA Approvals |
|------|----------|----------------|
| 2005 | 36 | 33 |
| 2006 | 14 | 9 |
| 2007 | 53 | 52 |
| 2008 | 19 | 19 |

---

[4]     Plaintiff imputes knowledge to Verizon based on the medical information submitted for FMLA purposes and from the Department of Veteran Affairs. *See* Pl. RSMF ¶ 26. The letter Plaintiff sent to his co-workers following the October 6, 2008 incident further supports his assertion that his medical condition was known to Defendants. *See* Docket No. 60-1 at 9-11 (stating that Plaintiff had "on many occasions openly talked about [his] condition). Plaintiff also asserts that he discussed his conditions with his superiors. J. Lopez Dep. at 236.

Def. SUMF ¶ 30. Nine of these 122 absence episodes (approximately seven percent) were not approved for FMLA leave. *See id.* These denials were based on insufficient hours worked in the prior 12 months and lack of documentation from a health care provider showing a serious health condition. *Id.* ¶ 31.

After each one of the FMLA-certified leaves, Plaintiff returned to his position at Verizon without discipline, demotion, termination, or a negative effect on his compensation. *Id.* ¶ 32; J. Lopez Dep. at 177, 189-190; Pl. RSMF ¶ 28.

### D. October 6, 2008 Incident and Investigation

On October 6, 2008, Plaintiff was on a service telephone call with an "irate" customer. Def. SUMF ¶ 40; J. Lopez Dep. at 191. After reviewing the account, Plaintiff concluded that the customer had a billing problem that he could not resolve. J. Lopez Dep. at 191; Def. SUMF ¶ 40. Plaintiff attempted to get assistance from a team leader or supervisor but was unable to do so. Def. SUMF ¶ 41; Pl. RSMF ¶ 34; J. Lopez Dep. at 192-93.

Plaintiff later stated that he felt "like the walls were closing in" on him. Def. SUMF ¶ 42; J. Lopez Dep. at 193; Pl. RSMF ¶ 35. Plaintiff stood up and yelled for help from a team leader. Def. SUMF ¶ 43; J. Lopez Dep. at 194. Ana Cardoso, a Verizon employee sitting across from Plaintiff, told him that he was "freaking her out." Def. SUMF ¶ 43 (citing J. Lopez Dep. at 198, 212); E. Lopez Decl. ¶ 11. Plaintiff then sat down, picked up a computer monitor and slammed it onto his desk. Def. SUMF ¶ 44 (citing J. Lopez Dep. at 205-07); Pl. RSMF ¶ 37 (stating that monitor was "knocked over"); Cruz Dep. (Docket No. 62-16) at 35 (stating that Plaintiff came to Cruz's work station and told her that he had just "slammed" his computer).

Plaintiff then went to the workstation of his wife, Li Min Cruz, and told her that he was going home because he was "not well." Def. SUMF ¶ 45; J. Lopez Dep. at 215-16. Plaintiff went to Defendant Lopez's office, where he spoke to team leader Elizabeth Pino. *Id.* ¶ 46. (Evidently, Defendant Lopez was not present.)

This is Plaintiff's account of his conversation with Pino:

[S]he said, "Jorge, you don't look well. You're not well. And the people that sit around you, they got scared, they saw you walk away, they saw you yelling, they saw you slam your monitor.

What's going on? I said, "I lost control. I don't know what to do. I can't help the customers. I'm not getting the support I need, and I don't know what to do." She said, "Jorge, you need to go see a doctor."

*Id.* ¶ 46; J. Lopez Dep. at 195-96.

Plaintiff then left the call center and went home. Def. SUMF ¶ 48; Pl. RSMF ¶ 43; J. Lopez Dep. at 215. Plaintiff did not interact with Defendant Lopez at all on October 6, 2008. Def. SUMF ¶ 47.

Plaintiff did not return to work the following day; he immediately applied for a leave of absence. *Id.* ¶ 50. His claim for a short-term disability leave was granted by Met Life, Verizon's disability vendor. *Id.* ¶ 50-51; Pl. RSMF ¶ 43. This disability leave ran concurrently with his FMLA leave. *Id.* ¶ 52.[5]

After the incident on October 6, 2008, the team leader on duty, Americo Colon, commenced an investigation. Def. SUMF ¶ 53. Colon took photos of Plaintiff's workstation and prepared a report, which included statements of witnesses. *Id.* Plaintiff contests the accuracy of these photos, and says they may be staged. Pl. RSMF ¶ 48; Workstation Photos, Pl. RSMF Exh. V (Docket 62-22).[6] When Plaintiff's wife, Li Min Cruz, was shown one of the photos at her deposition, she testified that it was not a "fair and accurate depiction of the scene" because she recalled the monitor being knocked over, and not the way it was depicted in the photo. Cruz Dep. (Docket No. 62-16) at 36-37. However, Cruz stated that she recalled the monitor being "knocked over." *Id.* at 35-36. Mariluz Diaz testified that the "flat screen" of the computer was facing down and the cords were pulled out. Diaz Dep. (Docket 62-15) at 45-46. Diaz did not recall seeing damage to the work station. *Id.* at 48.

Defendants assert that Plaintiff's co-workers gave statements that they were upset by the incident. Def. SUMF ¶¶ 54-55 (citing E. Lopez Decl. ¶ 12). Plaintiff asserts, *inter alia*, that the Court should rely on the written statements themselves, and not on the Defendants' interpretation. Pl. RSMF ¶¶ 49-51.

---

[5]    Plaintiff assets that FMLA leave should not run "concurrent as disability leave is dissimilar than FMLA leave." Pl. RSMF ¶ 47.
[6]    There is no evidence in the record supporting this assertion, and the photos appear to be consistent with the witness statements, including that of Li Min Cruz.

That is a fair point, and the statements themselves are appended as Exhibits 5 and 6 to the E. Lopez Decl. [7]

After the October 6, 2008 incident, Plaintiff sent a letter to his coworkers which stated in part:

> Hearing someone yelling at the top of their lungs for a manager and then watching them smash their monitor is not something anyone wants to have to deal with in an office environment. These actions are those of a person in distress. I have on many occasions openly talked about my condition. I am Sick. That is no surprise...
>
> I have to say that I am still shocked this happened again. These types of actions are not what I am known for. I am known to be off, hyper and unorthodox but not generally violent or aggressive. And by saying "again" I am admitting this is not the first time I have an episode of uncontrollable violent reactions. I have been under treatment for Bipolar\Manic Depression since I was 15 and Post Traumatic Stress Disorder for thirteen years.

Exhibit 8 (Docket No. 60-1); *see also* Def. SUMF ¶ 57, Pl. RSMF ¶ 52; J. Lopez Dep. at 250-51. Lopez's wife hand-delivered the three-page letter to Plaintiff's co-workers at the call center. J. Lopez Dep. at 251. The last two pages of the letter consisted of printed-out pages from WebMD discussing the symptoms of bipolar disorder and PTSD. *Id.*

Plaintiff returned to work in November 2008. Def. SUMF ¶ 58; Pl. RSMF ¶ 55. On November 24, 2008 Plaintiff was interviewed by Verizon Security investigator Christopher Heiser and Defendant Lopez.[8] Def. SUMF ¶ 59; Pl. RSMF ¶ 55. Plaintiff's wife, Li Min Cruz, was also present. *Id.*; Pl. RSMF ¶ 56.

---

[7]     Ana Cardoso submitted a statement that Plaintiff began yelling and panicking and slammed his computer monitor on his desk. E. Lopez Decl. Exh. 6 (Docket No. 60-1) at 16; Def. SUMF ¶ 55. Cardoso shouted back at Plaintiff: "What is wrong with you, you're freaking me out." *Id.* Silvia Espinosa submitted a similar statement that Plaintiff threw his computer and called for help. *Id.* at 15. Colon's notes also state that Plaintiff's co-worker Carlos Buelvas told Colon that Plaintiff called Buelvas about the customer's problem and while on the call with Buelvas said "[t]his is fucking crazy, fucking crazy." Def. SUMF ¶ 54; E. Lopez Decl. Exh. 5 (Docket No. 60-1) at 2. Plaintiff disputes receiving Buelvas's statement in discovery. Pl. RSMF ¶ 49.

[8]     Plaintiff asserts that Heiser did not adequately investigate the incident because he did not take photographs or take statements from witnesses. Pl. RSMF ¶ 55. However, the investigation notes and reports submitted in Exhs. 5 and 6 to the E. Lopez Decl. include several witness statements and photos. *See* Docket No. 60-1.

During that interview, Plaintiff stated, "I believe I lost control, no reason, loss of control." *Id.* (citing E. Lopez Decl. ¶ 14); Verizon Security Interview Memorandum, E. Lopez Decl. Exh. 8 (Docket 60-1); J. Lopez Dep. at 253-54.

The Parties dispute what, if any, damage was done to the Verizon computer during the incident. Defendants contend that Plaintiff admitted to destroying his computer monitor and to yelling for assistance during the October 8 incident. Def. SUMF ¶ 60. In his deposition, Plaintiff testified that during the interview following the October 6, 2008 incident, he told investigator Heiser that he destroyed the monitor. J. Lopez Dep. at 254. Now, however, Plaintiff denies that the computer monitor was destroyed, and denies ever admitting that it was destroyed. Pl. RSMF ¶ 57.

Plaintiff was suspended without pay as of November 24, 2008, pending the completion of Verizon's investigation. Def. SUMF ¶ 61. After the investigation concluded, the Plaintiff was terminated as of December 12, 2008, for "abusive conduct and property destruction in violation of the Business Code of Conduct." Def. SUMF ¶ 62; *see also* Pl. RSMF ¶ 59.

On or about June 16, 2009, Defendant Lopez received a call from a social worker at Mt. Sinai Hospital informing her that Plaintiff had made a death threat against Defendant Lopez. *Id.* ¶ 67. Defendant Lopez reported this threat to Verizon Security. *Id.*; E. Lopez Decl. Exh. 14 (Docket No. 60-2). Plaintiff asserts that Defendant Lopez misstated the facts. Although he does not directly deny making the threat, he notes that he was hospitalized at the time and undergoing treatment for his "disability and illness." Pl. RSMF ¶ 62.

### E. Union Grievance

On December 18, 2008, Plaintiff's union presented a grievance on his behalf regarding his suspension and termination. Def. SUMF ¶ 63; Exh. 10 (Docket No. 60-1). The grievance was denied, as was a subsequent appeal *Id.* ¶¶ 63-64; E. Lopez Decl. Exhs. 11, 12 (Docket No. 60-2). In a letter dated April 21, 2009, the union advised Plaintiff that, based on its review of the facts, it had elected not to take the denial of the grievance to arbitration. *Id.* ¶ 65; E. Lopez Decl. Exh. 13 (Docket No. 60-2). Plaintiff did not file a claim for breach of the duty of fair representation against the union, calling it a "waste of my time." *Id.* ¶ 66; J. Lopez Dep. at 242.

## F. Social Security Administration Proceeding

Plaintiff applied for Social Security disability benefits in 2009. J. Lopez Dep. at 250; Def. SUMF ¶ 68. His application alleged he was disabled starting on October 6, 2008, the date of the incident. *Id.* ¶ 70. On May 25, 2011, the Social Security Administration ("SSA") granted the application, finding that that Plaintiff had been disabled since October 6, 2008. Def. SUMF ¶ 69; SSA Notice of Decision (Docket No. 59-1) at 6. The ALJ gave full credit to the testimony of a vocational expert, finding:

> [G]iven the claimant's concentration deficit and his need for frequent absences from work as found in this decision, there would be no jobs in the regional or national economies that he would be capable of performing.

(Docket No. 59-1 at 5).

The ALJ recommended a continuing disability review in 36 months, noting that medical improvement could be expected with appropriate treatment. *Id.* The ALJ noted that Plaintiff "was not able to respond appropriately to others in a work environment that requires even limited interaction with supervisors and co-workers" and also that, at the time of the determination, Plaintiff was "unable to tolerate any interaction with the public." *Id.* at 11.

Plaintiff began receiving $1,500 per month in Social Security Disability payments. Def. SUMF ¶ 74; J. Lopez Dep. at 248-49. Plaintiff also received $450 per month in Social Security disability benefits for each of his two daughters. *Id.*; J. Lopez Dep. at 249.

## II.    DISCUSSION

The Defendants, Verizon and Estella Lopez, move for summary judgment on all counts of the Complaint. (Docket No. 56). For the reasons discussed below, the Defendants' motion will be granted.

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248; *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In

deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

## B. FMLA Retaliation Claims (Counts 1 and 4)

Counts 1 and 4 of the Complaint allege that the Defendants retaliated against the Plaintiff for exercising his rights under the FMLA by failing to reinstate him at the end of his leave and terminating his employment. Compl. ¶¶ 29, 47. To make out a *prima facie* case of retaliation under the FMLA, a plaintiff must prove that: (1) he invoked his right to FMLA benefits; (2) he suffered an adverse employment action; and (3) adverse employment action was causally related to his invocation of FMLA rights. *Lichtenstein v. University*

*of Pittsburgh Medical Center*, 691 F.3d 294, 302 (3d Cir. 2012); *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 146 (3d Cir. 2004).

FMLA retaliation claims require proof of the employer's retaliatory intent, which courts have analyzed by looking to employment discrimination law. *Lichtenstein*, 691 F.3d at 302. Claims based on circumstantial evidence are assessed under the burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[9] *Id.* The Plaintiff has the initial burden of establishing the prima facie case. *Id.* To do so at the summary judgment stage, he must point to evidence in the record sufficient to create a genuine factual dispute about each of the three elements of the retaliation claim. *Id.* (citing *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 508-509 (3d Cir. 2009); *Conoshenti*, 364 F.3d at 146). If he is able to make this showing, the burden of production shifts to the employer to "articulate some legitimate, non-discriminatory reason" for its decision. *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). Once the employer meets this minimal burden, the Plaintiff must point to some direct or circumstantial evidence from which a fact finder could "reasonably … disbelieve [the employer's] articulated legitimate reasons." *Id.* (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994)).

### 1. Plaintiff's *prima facie* case of retaliation.

Reading the record in the light most favorable to the Plaintiff, I find sufficient (albeit minimal) evidence to support a *prima facie* case of retaliation. The first prong of Plaintiff's retaliation claim is not in dispute: following the October 2008 incident, Plaintiff invoked his rights under the FMLA and was placed on FMLA leave concurrent with his short-term disability leave of absence. Def. SUMF ¶¶ 51-52. It is also not disputed that Verizon terminated Plaintiff's employment in December 2008. *Id.* ¶ 62. The dispute concerns the third prong: whether Plaintiff's termination was causally related to his invocation of FMLA rights.

Plaintiff argues that there was an "agenda to find an excuse to terminate" him and that the Defendants acted without giving due consideration to his medical issues. Opp. (Docket No. 47) at 8-9. Plaintiff makes several arguments in support of that claim.

---

[9]    In contrast, claims relying on direct evidence of retaliation use the less taxing mixed-motive framework set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 276-77 (1989).

First, Plaintiff suggests that Verizon believed the leave granted to him following the October 6, 2008 incident was unwarranted, and that the termination was connected to that belief. Opp. at 7. As evidence of this, Plaintiff proffers that Defendant Lopez prepared an "Absence Fraud Case Summary" which stated that Plaintiff was perpetrating a fraud and should not have received disability or FMLA leave. Opp. at 7. This assertion, however, mischaracterizes Defendant Lopez's deposition testimony. She was not the author of the relevant report; as she testified in her deposition, it was prepared by Maria Gonzalez and submitted to Verizon's disability vendor, Met Life. E. Lopez Dep. at 77-80. In any event, Met Life subsequently *approved* the disability leave. *Id.* at 80.

Second, Plaintiff suggests that the investigation led by Heiser preceding his termination was not done in good faith because Defendant Lopez and Perla Lederman did not give Heiser the "necessary documentation and information" pertaining to his FMLA and disability leave. Opp. at 8. Plaintiff also asserts that information relating to Plaintiff's disability and the earlier incident was not submitted by Verizon during the grievance process. *Id.* at 9. Plaintiff does not specify what information should have been submitted, but argues that Verizon had "full knowledge" that "episodes" would occur that could damage property or upset co-workers. Opp. at 8-9. He contends that Verizon management "failed to discuss [Plaintiff's] medical issues and accommodation granted," thereby "stone wall[ing] the medical causation" for the October 2008 incident. *Id.*

These arguments do not tend to establish a causal connection between Plaintiff's FMLA leave and his termination. Plaintiff's conclusory allegations of potential discrimination based on his medical condition do not obviate his burden of establishing a *prima facie* case of FMLA retaliation. *See Allia v. Target Corp.*, Civ. No. 07-4130 (NHL), 2010 WL 1050043 at *11 (D.N.J. March 17, 2010). Plaintiff's argument that, even before the October 2008 incident occurred, Verizon was on notice of his medical issues, *see* Opp. at 9, is something of a *non sequitur*. Indeed, Plaintiff acknowledged at his deposition that he was never demoted, terminated, or otherwise disciplined after taking multiple FMLA leaves during his employment at Verizon. See Def. SUMF ¶ 32 (quoting J. Lopez Dep. at 190). The notion that Verizon had long known about his medical condition tends, if anything, to detract from a finding of causation as to FMLA retaliation.

Nevertheless, the timing of the termination bears consideration. Plaintiff returned from his FMLA leave in November 2008, at which point he was suspended pending the resolution of Verizon's investigation. Def. SUMF ¶¶ 58-

61. He was terminated on December 12, 2008. *Id.* ¶ 62. The mere fact that a protected activity preceded an adverse employment action is not ordinarily sufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two. *Allia v. Target Corp.*, 2010 WL 1050043 at *10 (granting summary judgment for defendant where plaintiff failed to show causality for FMLA claim); *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279-80 (3d Cir. 2000); *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir.1997) (abrogated on other grounds).

However, as *Robinson* clarified, a causal link may be inferred where the timing of the alleged retaliation is "unusually suggestive". 120 F. 3d at 1302 (discussing split in Third Circuit cases on whether timing by itself can support finding of causation). The evidentiary value of temporal proximity depends on the stage of the *McDonnell Douglas* analysis. When, as here, the plaintiff is attempting to satisfy his *prima facie* burden on summary judgment, close temporal proximity can, by itself, support a finding of causation. *See Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989). At this stage, after all, the court is only assessing whether the employer may be required to explain itself. *See also Smith v. Allen Health Sys.*, 302 F.3d 827, 833 (8th Cir. 2002) (citation omitted) (stating that *McDonnell Douglas* "requires only a minimal showing before requiring the employer to explain its actions"); *James v. New York Racing Ass'n*, 233 F.3d 149, 153 (2d Cir. 2000) (finding that a plaintiff's burden on presenting a prima facie case under *McDonnell Douglas* is "minimal").

Plaintiff did not expressly rely on the timing of the termination in his Opposition. Nevertheless, I see that the temporal proximity of the termination and leave is undisputed. Therefore, viewing the facts in the light most favorable to the non-movant Plaintiff, as I must, I will assume *arguendo* that the Plaintiff has satisfied the causality prong. I note, however, that there is little else in the record to indicate that Plaintiff's termination was causally connected to the October 2008 FMLA-protected leave.

### 2. Verizon's legitimate, non-retaliatory reason for terminating the Plaintiff's employment.

The second stage of the *McDonnell Douglas* shifts the burden of production to the employer to "articulate some legitimate, non-discriminatory reason" for its decision. *Lichtenstein*, 691 F.3d at 302. Verizon proffers that Plaintiff's termination was based on his violations of its Code of Conduct. Def. Br. (Docket No. 38) at 9. This non-retaliatory explanation for the Plaintiff's

termination satisfies the Defendant's minimal burden of production. *See Lichtenstein*, 691 F.3d at 302 (stating that defendant's burden is minimal).

The Code of Conduct prohibits violent, hostile, and abusive behavior in the workplace, as well as the destruction of Verizon's property and computer systems. Def. SUMF ¶¶ 6-7. The Defendants argue that Verizon was "entitled to promulgate those policies and demand adherence thereto as a condition of continuing employment." Def. Br. at 9. They assert that Plaintiff's conduct on October 6, 2008 violated the Code of Conduct and was the basis for his termination. *Id.*

The Parties do not dispute that on October 6, 2008 Plaintiff stood up at his desk while on a customer call, shouted, and slammed his computer monitor on his desk. Def. SUMF ¶¶ 40 – 44, 53, 57, 60. Plaintiff described his conduct as having "lost control." J. Lopez Dep. at 195. Witness statements from three other Verizon employees are consistent with this account, as are photos taken of Plaintiff's workstation. *See* E. Lopez Decl. Exhs. 5-6 (Docket No. 60-1) at 2-4, 15-16. While there may be a discrepancy as to the parties' accounts of the extent of the damage, there is no doubt as to the existence of a substantial breach of the Code of Conduct.

This explanation for Plaintiff's termination is non-retaliatory and thus satisfies the Defendants' burden of articulating a legitimate reason for Plaintiff's termination.

### 3. There is no evidence that the articulated reason for the Plaintiff's termination is pretextual.

Because the Defendants have met their burden of proffering a legitimate, non-retaliatory reason for terminating Plaintiff's employment, Plaintiff must persuade the Court that the Defendants were actually motivated by a retaliatory motive. *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir. 1994); *Lichtenstein,* 691 F.3d at 310-11. Plaintiff's evidence rebutting the employer's proffered legitimate reasons, which may be direct or circumstantial, must allow a fact finder to reasonably infer that the proffered non-discriminatory reason was either pretextual or a *post hoc* fabrication. *Id.*

The proffered reason for Plaintiff's termination was not a *post hac* fabrication. Plaintiff does not dispute that Defendants' proffered reason for his termination was his alleged violation of the Code of Conduct. Further, the record is devoid of any evidence indicating that the Defendants gave any other reason for Plaintiff's termination at the time of his dismissal.

There is also no evidence in the record showing that Verizon's reason for the termination was pretextual. As established above, the Defendants' position that Plaintiff's conduct violated the Code of Conduct is supported by the record.

It is also undisputed that Plaintiff was aware of his obligations under the Code of Conduct. He had previously been suspended for 15 days after a 2006 incident in which he allegedly "became aggressive and screamed profanities at Verizon managers." Def. Br. at 10; Def. SUMF ¶¶15-16. At that time, Plaintiff was warned that his conduct violated Verizon's Business Code of Conduct and that further violations could result in termination. Def. Br. at 10; SUMF ¶ 18. Nor was Verizon's decision ill-considered or precipitate. After the October 2008 incident, Verizon conducted an investigation that included interviews of the witnesses and of Plaintiff himself. *Id.* ¶¶ 52-62.

Plaintiff criticizes certain details of the Defendants' account, such as the photos taken showing damage to his workstation and Defendants' failure to turn over hand-written notes from Investigator Heiser as part of the record of Verizon's investigation following the incident. *See* Pl. RSMF ¶¶ 48, 55, 57.[10] I disregard these issues; to the extent they may be contested, they are not material to my decision. In light of the other evidence in the record, a jury could not find that the failure to include photographic documentation or handwritten notes made the difference between a retaliatory and non-retaliatory dismissal based on the making of a FMLA claim.

Plaintiff argues that the termination was actually based on the violation of FMLA rights "afforded to him by his employer." Opp. at 9. However, Plaintiff puts forth no evidence supporting that view, or evidence showing that Verizon's stated reason for his termination was pretextual. In fact, the record, including Plaintiff's deposition testimony, is replete with references to Plaintiff's disruptive conduct. *See also Polonsky v. Verizon Commc'ns Corp.*, Civ. No. 09-4756 (FLW), 2011 WL 5869585, at *12 (D.N.J. Nov. 22, 2011) (dismissing state law wrongful termination claim where defendant Verizon's proffered explanation that plaintiff's behavior was hostile and abusive was supported by the record).

Taking an FMLA leave of absence does not, of course, *shield* a plaintiff from discipline for misconduct. *See Adams v. Fayette Home Care and Hospice*, 452 Fed. App'x 137, 141 (3d Cir. 2011) (affirming summary judgment in FMLA

---

10    Heiser's notes in typed form are included as part of his report. E. Lopez Decl. Exh. 8 (Docket No. 60-1) at 20-21.

claim of employee terminated upon return from FMLA leave for misconduct occurring prior to leave); *Allia*, 2010 WL 1050043, at *11 (D.N.J. 2010) (dismissing FMLA claim of employee terminated for poor performance and insensitivity prior to FMLA absence). Moreover, Plaintiff had taken numerous other FMLA leaves without any adverse consequences. J. Lopez Dep. at 177, 189-190. For Plaintiff to prevail, he would have to point to evidence that his termination was not based on his misconduct, or that it was based on his invocation of his rights under FMLA. Such evidence is lacking.

As noted above, virtually the only evidence suggesting a retaliatory reason for termination is the temporal proximity between Plaintiff's leave and his termination. While that was sufficient to meet Plaintiff's minimal initial burden, it is not enough to establish pretext or demonstrate retaliatory motivation. *See Farrell*, 206 F.3d at 279-80 (cautioning that weight given to temporal proximity depends on facts of the case and context in which issue arises). Here, there is no additional evidence—direct or circumstantial—that bolsters the weak inference from temporal proximity. The evidence of record consistently supports the Defendants' proffered explanation. It provides no support for the view that the Defendants inexplicably, for reasons unrelated to Plaintiff's misconduct, decided to treat this FMLA leave differently from all of the ones that preceded it.[11]

In sum, the facts here do not give rise to a genuine factual dispute regarding the reason for Plaintiff's termination. Although Plaintiff argues that he was terminated for unlawful reasons, his conclusory allegations do not create a jury issue. Plaintiff had knowledge of his obligations under the Code of Conduct and substantially admitted to the conduct held to be in violation of it. Simply put, there is not sufficient evidence in the record to support an alternate explanation for his termination. Indeed, Plaintiff's asserted explanation for his termination is blatantly contradicted by the record.

"Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Scott v.*

---

[11] To some degree, Plaintiff's arguments seem to suggest that his underlying medical condition (as opposed to his invocation of his rights under the FMLA) was the true basis for his termination. *See* Opp. at 8-9. This argument is better placed in support of his LAD claim, and it is discussed there. *See* Section C, *infra*.

*Harris*, 550 U.S. 372, 380 (2007) (quoting same). The existence of *some* alleged factual dispute between the Parties does not defeat the Defendants' otherwise properly supported motion for summary judgment. *Scott*, 550 U.S. at 380. The minor factual disputes here are not material to the issue of FMLA retaliation.

## C. LAD Claims (Counts 2 and 3)

Plaintiff has alleged two counts of disability discrimination in violation of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1: a failure to accommodate claim (Count 2) and a hostile work environment claim (Count 3). Compl. ¶¶ 33-45.

### 1. Plaintiff has failed to show a *prima facie* case of disability discrimination under the LAD.

Discrimination claims pursuant to the LAD, like FMLA retaliation claims, follow the *McDonnell Douglas* burden-shifting paradigm. *Victor v. State*, 203 N.J. 383, 4 A.3d 126, 140-41 (2010). To state a *prima facie* case of disability discrimination under the LAD, Plaintiff must show that (1) he qualified as an individual with a disability, or is perceived as having a disability, as defined by statute; (2) he is qualified to perform the essential functions of the job, or was performing those essential functions, either with or without a reasonable accommodation; (3) he experienced an adverse employment action; and (4) the employer sought another to perform the same work after he was removed from the position. *See Victor*, 203 N.J. at 409-410.

The only disputed prong of the LAD claim is whether Plaintiff was qualified to perform the essential functions of his job with or without a reasonable accommodation. *See* Def. Br. at 12-13.

The Defendants argue that Plaintiff cannot state a claim for disability discrimination or, in the alternative, that such a claim is judicially estopped by the SSA's finding that Plaintiff was disabled as of October 6, 2008. Def. Br. at 12-13. A failure of proof would be analyzed under the usual summary judgment framework. The judicial estoppel aspect, however, requires some explanation.

An application for Social Security Disability Insurance ("SSDI") benefits (particularly a successful one) may preclude a cognizable disability discrimination claim. *See Cleveland v. Policy Management Sys. Corp.*, 526 U.S. 795, 119 S.Ct. 1597 (1999) (considering ADA claim). To survive a motion for summary judgment, however, the plaintiff must explain why the prior SSDI

application or award is consistent with his current claim that he could "perform the essential functions" of his previous job. *Id.* at 798.

Those two types of claims may coexist, for example, where a disabled person cannot perform the "essential functions" of his job, but could do so with a reasonable accommodation. *Id.* at 803. The SSA determination for SSDI benefits does not take into account the possibility of a reasonable accommodation. *Id.* Therefore a disability discrimination suit claiming that the plaintiff can perform his job with the accommodation may be consistent with an SSDI claim that the plaintiff could not perform his job (or other jobs in the national economy) without it. *Id.*

### a. Failure to Accommodate (Count 2)

This case does not resemble the typical failure to accommodate claim, which may involve a request to be transferred to a position with different duties. Plaintiff requested one type of accommodation here: to be transferred to another chain of command under Julio Cirilo. *See* Opp. at 15; Def. SUMF ¶¶ 38-39.

That accommodation was granted in 2007; Plaintiff was transferred to a group supervised by Cirilo. Def. SUMF ¶ 34-35; J. Lopez Dep. at 183-84, 243-44. In 2008, however, Cirilo himself was transferred to a different position. *Id.* ¶ 38; E. Lopez Dep. at 58. Plaintiff then requested again to be reassigned to Cirilo's supervisory group. *Id.* ¶ 39; E. Lopez Decl. ¶ 10. After consulting with Verizon Labor Relations, Defendant Lopez advised Plaintiff that Cirilo no longer occupied that kind of supervisory position. *Id.* Cirilo's new staff job did not have managers or associates in its chain of command. E. Lopez Decl. ¶ 9. In particular, Cirilo did not have a Bilingual Sales and Service team reporting to him. Def. SUMF ¶ 39; E. Lopez Decl. ¶ 10. The requested transfer was not possible.

Verizon's denial of Plaintiff's second reassignment request, after granting the first, does not suggest a cognizable claim that Plaintiff was denied a reasonable accommodation. While Defendants had a duty under the LAD to offer a reasonable accommodation, this duty does not "cloak the disabled employee with the right to demand a particular accommodation." *Victor*, 203 N.J. 383, 4 A.3d at 149; *see also Gaul v. Lucent Tech. Inc.*, 134 F.3d 576, 581 (3d Cir. 1998) (affirming summary judgment on ADA claim in favor of employer where proposed accommodation to reduce exposure to coworkers causing plaintiff "prolonged and inordinate stress" would impose impractical burden on employer). The evidence is undisputed that the requested reassignment to

Cirilo was not possible or reasonable; Cirilo himself no longer occupied an appropriate supervisory position. Plaintiff did not request any other accommodation. Even now, he does not suggest any other accommodation.

On that score, the record of Plaintiff's SSDI proceeding is revealing. If an applicant cannot be accommodated in the particular position he occupied, he must demonstrate that there was a vacant, funded position for which he was qualified and to which he could have been transferred. *Donahue v. Consolidated Rail Corp.*, 224 F.3d 226, 229-230 (3d Cir. 2000) (Rehabilitation Act claim); *Castellani v. Bucks County Mun.*, 351 Fed. App'x 774, 777 (3d Cir., Nov. 10, 2009) (ADA claim) (citing *Williams v. Philadelphia Housing Auth. Police Dep't.*, 380 F.3d 751, 770 (3d Cir. 2004). In Plaintiff's case, the ALJ found, such a transfer was unlikely if not impossible. Plaintiff "was not able to respond appropriately to others in a work environment that requires even limited interaction with supervisors and co-workers" and "is unable to tolerate any interaction with the public." *Id.* Def. SUMF ¶ 72. The ALJ determined that Plaintiff would have been unable to return to his position at Verizon as of October 6, 2008, because of the "skill level it required." *Id.* ¶ 73. In fact, because of Plaintiff's concentration deficit and need for frequent work absences, "there would be no jobs in the regional or national economies that he would be capable of performing." *Id.* ¶ 71.

The ALJ, to be sure, was not explicitly addressing the possibility of a reasonable accommodation. But this is not an equivocal finding of disability, or one that suggests the possibility of a work-around. I agree with the Defendants that the ALJ's finding strongly suggests that the Plaintiff could not have been accommodated. If there is no job, anywhere, that the worker is capable of performing, then it would be difficult to hold the company liable for failing to design one for him. *See Mengine v. Runyon*, 114 F.3d 415, 417-20 (3d Cir. 1997). In order to so find, I would have to identify an effective accommodation that would be reasonable, yet result in a position that does not correspond to any position now existing in our economy.

Assuming there is such a case, I have not seen any evidence that this is it. Plaintiff has not identified a viable alternative position, or a viable alteration to the one he occupied (other than reassignment to Cirilo). I see no plausible showing that Plaintiff's position, or one reasonably available, could be tailored to avoid the effects of his PTSD and bipolar disorder.

Accordingly, Plaintiff has failed to proffer an adequate explanation of how he was totally disabled as of October 6, 2008, and yet able to perform the

essential functions of his job, or an alternative vacant job. *See Cleveland*, 526 U.S. at 806; *Castellani*, 351 Fed. App'x at 777. He has not drawn an adequate distinction between his particular failure-to-accommodate claim and the SSA ALJ's finding that he is completely disabled. Therefore, there is no triable issue of fact regarding Plaintiff's reasonable accommodation claim. Summary judgment must be granted in favor of the Defendants on this count.

### b. Hostile Work Environment (Count 3)

To the extent that Plaintiff alleges a separate claim of LAD discrimination on the basis of a hostile work environment, that claim also fails. To prove a claim for a hostile work environment, Plaintiff must show that (1) he is in a protected class; (2) he was subjected to conduct that would not have occurred but for that protected status; and (3) that it was severe or pervasive enough to alter the conditions of employment. *Victor*, 4 A.3d at 141. Plaintiff has not made a facial showing that the second and third elements are met.

Plaintiff's allegations of discriminatory conduct fall short. Plaintiff alleges that Defendant Lopez would "openly taunt and provoke" him with statements such as, "We are not going to have any problems, right?" Compl. ¶¶ 10-15. Plaintiff also alleges that he was "in essence forced to resign as [union] Steward in order to avoid contact with Estella Lopez..." *Id.* ¶ 11. When Plaintiff returned to Defendant Lopez's group in 2008 she "continued to harass and ride Mr. Lopez, fully aware of his limitations and disabilities." *Id.* ¶ 14. Plaintiff now argues that it is "apparent" that Defendant Lopez was "out to hurt this employee to ensure that his employment would be terminated." Opp. at 18.

Defendants counter that Plaintiff admitted in his deposition that his interactions with Lopez were "uneventful, nonremarkable." Def. Br. at 20 (citing Def. SUMF ¶ 13). They also point to a lack of evidence that Defendant Lopez was aware of Plaintiff's disabilities. *Id.* at 21. The record is not undisputed as to the latter issue; Plaintiff alleges that his disabilities were generally known; his letter to fellow employees after the October 2008 incident says as much; and one supervisor, Pino, allegedly stated that he should be seeing a doctor. (*See* pp. 7-8, *supra*.). The record is bereft, however, of any indication that Defendant Lopez, or anyone else at Verizon, engaged in conduct based on Plaintiff's disabilities that altered the conditions of his employment.

Plaintiff does not identify any conduct or statements made by Defendant Lopez indicating that her treatment of him was premised on, or at all related to, his disability. During his deposition, Plaintiff stated that he had never directly discussed his medical conditions with Defendant Lopez. J. Lopez Dep. at 136.

Further, when asked about the source of his discord with Defendant Lopez, he identified the issues as relating to time off, scheduling, and fire safety. *See id.* at 238-39. These issues all seem to relate generally to conditions of employment, not to Plaintiff personally. Fairly emblematic of these is Plaintiff's statement that Dalia Perez told representatives generally (not Plaintiff personally) that they should not "make a habit" of requesting time off. *Id.* at 237. When Plaintiff objected, Perez replied that she would not apologize unless Defendant Lopez directed her to do so. *Id.* At best, this suggests that, in some very general way, Defendant Lopez was the ultimate source of some of Plaintiff's on-the-job dissatisfaction.

In assessing a hostile environment claim, the Court must consider the cumulative effect of the incidents identified by the Plaintiff. *Lehmann v. Toys R Us, Inc.*, 132 N.J. 587, 626 A.2d 445, 455 (1993). Even taking all of these incidents together, however, no reasonable fact finder could find that this conduct related to Plaintiff's medical condition or that it impermissibly altered the conditions of his employment for the worse. Plaintiff's issues or conflicts with Defendant Lopez are run-of-the-mill personality and administrative conflicts. True, Plaintiff's psychological condition might have made it more difficult for him to negotiate these routine workplace frustrations. That does not equate to Defendants' creation of a hostile environment based on his disability. Plaintiff has not met his burden of establishing a *prima facie* case of LAD discrimination.

### 2. There is no evidence showing that Verizon's articulated reason for terminating the Plaintiff is pretext for discrimination.

In addition, and in the alternative, the hostile environment claim must be denied because there is no genuine factual issue as to whether Defendants' proffered explanation for Plaintiff's termination was a pretext. This "pretext" issue essentially duplicates that under the FMLA, discussed above. *See* Section II.B.3, *supra.*

The LAD prohibits adverse action based on an employee's disability, but does *not* "prevent adverse employment treatment premised upon the employee's . . . conduct." *Barbera v. DiMartino*, 702 A.2d 1370, 1379 (N.J. Super. App. Div. 1997). In *Barbera*, the plaintiff was terminated after he assaulted his supervisor during a "temporary psychotic episode." *Id.* at 1371. The Court affirmed the trial jury's finding that the termination did not violate the LAD, applying the federal majority view that disability discrimination law is not

intended to prevent discrimination "upon egregious or criminal conduct even if such conduct results from handicap or disability." *Id.* at 1381-82. *See also Iwanejko v. Cohen & Grigsby*, 249 Fed. App'x 938, 943 (3d Cir. Oct. 11, 2007) (affirming summary judgment on ADA claim where employer terminated an employee who began to shout and use profanities during an acute psychotic episode), *cert. denied*, 555 U.S. 829 (2008).[12]

Thus Plaintiff's disability does not shield him from dismissal for reasons related to his conduct. Plaintiff has failed to point to any support in the record for his position that the Defendants' proffered explanation was pretextual or fabricated. For the reasons stated above, there is no material conflict in the evidence: Plaintiff was dismissed for a clear violation of the employee Code of Conduct.

In sum, there is no genuine issue of material fact regarding Plaintiff's LAD claims. Plaintiff has failed to show a genuine factual dispute regarding both his reasonable accommodation and hostile work environment claims.

### 3. Aiding and Abetting Liability of Estella Lopez (Counts II and III)

Even if Plaintiff had a meritorious LAD claim against his employer Verizon, liability would not extend personally to Defendant Lopez. Under the LAD, a supervisor does not constitute an employer. *Cicchetti v. Morris Cnty. Sheriff's Office*, 947 A.2d 626, 645 (N.J. 2008). Individual liability can arise only through "the aiding and abetting" mechanism of the statute. *Id.* To prove an employee liable as an aider or abettor, Plaintiff must show (1) the party whom the defendant aided performed a wrongful act causing an injury; (2) the defendant was generally aware of his role as part of an overall illegal or tortious activity at the time that he provided the assistance; and (3) the defendant knowingly and substantially assisted the principal violation. *Id.*; *Hurley v.*

---

[12]    Additionally, the LAD recognizes that "certain handicapped persons could be legitimately precluded from performing certain tasks due to their conditions." *Viscik v. Fowler Equip. Co.*, 800 A.2d 826, 833, 173 N.J. 1 (2002) (citing *Anderson v. Exxon Co.*, 89 N.J. 483, 493 (1982)). Thus, the LAD's protections do not apply if "the nature and extent of the handicap reasonably precludes the performance of the particular employment." *Id.* (quoting N.J.S.A. 10:5-4.1); N.J.S.A. 10:5-2.1 (the LAD does not "prevent the termination . . . of any person who in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment, nor to preclude discrimination among individuals on the basis of competence, performance, conduct, or any other reasonable standards.").

*Atlantic City Police Dep't*, 174 F.3d 95, 127 (3d Cir.1999) (defining aiding and abetting liability).

The liability of Defendant Lopez, then, depends on that of Verizon. Because I find that Plaintiff has failed to carry the burden of persuasion under *McDonnell Douglas* showing that Verizon acted unlawfully, an aiding and abetting claim against Defendant Lopez cannot survive, either.

### D. Contract Claims (Counts 5, 6, 7)

Plaintiff's remaining claims are contract based: breach of duty (Count 5); breach of contract (Count 6); and breach of the implied covenant of good faith and fair dealing (Count 7). Compl. ¶¶ 50-67. Plaintiff did not have an employment contract. Accordingly, these claims are based on alleged contractual duties in Verizon's union agreements and/or Code of Conduct. *See* Compl. ¶¶ 52, 58, 63.; Opp. at 20, 22. These claims are not supported by the record and fail as a matter of law.

### 1. Code of Conduct

First, Plaintiff cannot premise his contract claims on the Code of Conduct. In order to state a claim based on an employment manual or widely distributed policy, the Plaintiff must point to a provision that contains "an express or implied promise concerning the terms and conditions of employment." *Witowski v. Thomas J. Lipton*, 136 N.J. 385, 643 A.2d 546, 550 (1994) (citations omitted). An implied contract can only rest on the reasonable expectations of employees. *Id.* (citing *Woolley v. Hoffman LaRoche*, 99 N.J. 284, 491 A.2d 1257, *modified*, 101 N.J. 10, 499 A.2d 515 (1985)). Factors affecting reasonable expectations include the comprehensiveness of the termination policy and the context of the manual's preparation and distribution. *Id.*

In any case, however, an implied contract based on an employment manual may be negated by the inclusion of a "clear and prominent" disclaimer. *Id.* at 554 (citing *Woolley*, 99 N.J. at 285).; *see also Polonsky*, 2011 WL 5869585 at *9; *Nicosia v. Wakefern Food Corp.*, 136 N.J. 401, 643 A.2d 554, 559-60 (1994). An effective disclaimer must be "expressed in language such that no one could reasonably have thought [the manual] was intended to create legally binding obligations." *Nicosia*, 643 A.2d at 560 (internal quotation omitted).

Verizon's Code of Conduct explicitly states that it is "not an employment contract" and that it does not "give [employee] rights of any kind." Code of

Conduct (Docket No. 76) at 10; Def. SUMF ¶ 3. The disclaimer is located in the introductory section of the Code of Conduct under the heading "Legal Notice." *Id.* This district court, in fact, has held that the Verizon Code of Conduct's disclaimer is adequately clear and prominent. *See Polonsky*, 2011 WL 5869585 at *9 (granting summary judgment against plaintiff claims brought on basis of Verizon's Code of Conduct).

Plaintiff argues that the Verizon manual cited in *Polonsky* may or may not be the same manual at issue here. Opp. at 20. He also points to the size of the font and exclusion from the table of contents as further arguments against the sufficiency of the disclaimer. *Id.* at 20-21. The cited language in the Code of Conduct's disclaimer closely resembles that analyzed by the *Polonsky* Court. *Compare* Code of Conduct (Docket No. 76) at 10; 2011 WL 5869585 at *9.[13] In light of its language explicitly disclaiming any legal rights, a reasonable employee could not think that the manual was intended to create a legally binding obligation. I have inspected the Code of Conduct and find the presentation of the disclaimer to be sufficiently conspicuous and clear as a matter of law.

The disclaimer, then, is dispositive. The Code of Conduct is not an employment contract and cannot furnish the basis for a contract claim.

### 2. Union Agreements

To the extent that Plaintiff's contract claims are based on a breach of union agreements, they also fail as a matter of law. First, Plaintiff has not alleged that Verizon breached any provision of a Collective Bargaining Agreement. Secondly, any such claim would be preempted by Section 301 of the Labor Management Relations Act ("LMRA"). 29 U.S.C. § 185(a). Section 301 completely pre-empts state law claims created by or dependent upon a collective bargaining agreement. *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 405-06 (1988); *Wilkes-Barr Publishing Co. v. Newspaper Guild of Wilkes-Barr*, 647 F.2d 372, 380 (3d Cir. 1981), *cert denied*, 454 U.S. 1143 (1982); *Pagano v. Bell Atlantic-New Jersey*, 988 F. Supp. 841, 846-47 (D.N.J. 1997). A plaintiff's claim will be pre-empted unless he simultaneously brings a claim against the union for breach of a duty of fair representation, or proves such a breach. *DelCostello v. Int'l Brotherhood of Teamsters*, 462 U.S. 151, 164 (1983) (quoting *United Parcel Serv., Inc. v. Mitchell*, 451 U.S. 56, 66-67 (1981)

---

[13] One distinction in the disclaimers is that the waiver's language here regarding at-will employment exempts those employees governed by a collective bargaining agreement. Code of Conduct at 10. That distinction is not material here.

(Stewart, J. concurring in the judgment); *Felice v. Sever*, 985 F.2d 1221, 1226 (3d Cir. 1993).

Plaintiff asserts no claim against the union for breach of the duty of fair representation. Plaintiff acknowledged in his deposition that he did not take any action against the union. Def. SUMF ¶ 21. Plaintiff's contract claims, to the extent they may purport to rest on union agreements, are preempted as a matter of law.

Summary judgment is therefore granted to the Defendants on the contract claims, Counts 5, 6, and 7 of the Complaint.

## III.    CONCLUSION

The Defendants have carried their burden of showing that no genuine issue of material fact exists for each of the Counts in the Amended Complaint. In response, Plaintiff has failed to put forth any actual evidence that any triable issue of material fact remains. Accordingly, summary judgment will be **GRANTED** for the Defendants on all Counts.

An Order will be entered in accordance with this Opinion.

Dated:  February 4, 2014

**Hon. Kevin McNulty**
**United States District Judge**